UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICHARD PHILIPPE,<br><br>Defendant | CRIMINAL No. 19-cr-10328-FDS |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by Rachael S. Rollins, United States Attorney, and Fred M. Wyshak, III, Assistant United States Attorney for the District of Massachusetts, in accordance with the United States Sentencing Commission Guidelines Manual ("U.S.S.G." or "the Guidelines"), hereby submits this Memorandum in support of its position on sentencing. Defendant was convicted of Possession of Ammunition After a Previous Conviction of a Crime Punishable by Imprisonment for a Term Exceeding One Year and Illegally Transporting Into or Receiving in State of Residence One or More Firearms, following a 4-day jury trial. Defendant's Guideline sentencing range is 51 – 63 months incarceration. <u>The Government recommends a sentence of 63 months incarceration, 3 years supervised release, and a fine of $200,000.</u> This sentence represents the top of the range endorsed by the Guidelines, and for the reasons set forth herein, is "sufficient, but not greater than necessary" to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a).

I.     <u>FACTUAL SUMMARY</u>

In about February 2019, Defendant drove from Massachusetts to Georgia. While Defendant was in Georgia, an associate sold him a firearm. Presentence Investigation Report,

rev. March 28, 2022 ("PSR"), at ¶ 17.  The transaction precipitated more frequent trips to Georgia where Defendant acquired more firearms.  In the following months, Defendant transported dozens of firearms into Massachusetts to sell from a warehouse he leased in Taunton.  PSR at ¶¶ 17-19.  As Defendant told investigators at the time of his arrest, he became "a businessman."  What Defendant did not admit was that he knew this "business" was unlawful and merely a shallow euphemism for the illegal trafficking and sale of firearms.

Defendant had been previously convicted of carrying a pistol without a license in Rhode Island in 2004.  PSR at ¶¶ 12, 47.  Defendant was sentenced to a term of 10 years imprisonment but served the vast majority of that sentence on probation.  *Id*.  As a result of the conviction, Defendant was prohibited from possessing firearms and ammunition under federal law.

Nevertheless, Defendant wished to be in the business of dealing firearms, and he was willing to use criminal means to achieve his goal.  Conscious of the laws and regulations restricting the transfer of firearms, including the requirement that licensed dealers conduct background checks, Defendant obtained firearms through a straw purchaser.[1]  PSR at ¶ 15.  The straw purchaser was identified in the course of the criminal investigation and interviewed twice, in July 2019 and August 2019.  The straw purchaser reported selling firearms "mostly [to] Rich" "from the last few months" and that Defendant "would buy anything."[2]  *See* Exhibit 1, Records

---

[1] The straw purchaser's identity was disclosed at trial and is included in the PSR.

[2] The Government recognizes that the straw purchaser's statements may be scrutinized as self-serving.  However, the evidence in the case largely corroborates the straw purchaser's account.  Defendant made at least five or six trips to Georgia between March 2019 and June 2019.  Electronic communications between Defendant the straw purchaser suggest that Defendant bought in bulk.  PSR at ¶ 20.  One of Defendant's customers claimed to purchase "around 14" firearms just by themselves.  *See* Exhibit 2, Trial Transcript, December 16, 2021, 5:25-6:4.  The same customer observed Defendant sell an additional 12 to 18 firearms to his brother and an associate, Ex. 2, December 16, 2021, 10:4-13, 16:12-22, and the same customer attempted to sell another 9 firearms from Defendant through social media.  Ex. 2, December 16,

of Interviews with Straw Purchaser, July 1, 2019 and August 8, 2019. According to the business records of Dahlonega Gold and Pawn, a licensed firearms dealer in Georgia, 118 firearms were sold to the straw purchaser from March 2019 to June 2019. PSR at ¶ 19.

Defendant dealt primarily but not exclusively in semi-automatic handguns. Defendant also obtained military-style firearms, extended magazines and drum magazines, lasers sights, suppressors, ammunition, and other accessories, all of which he sold at his warehouse. PSR at ¶ 23. A convicted felon purchased numerous firearms from Defendant to resell at higher prices through social media.[3] *Id*. The same convicted felon also tried to find buyers for Defendant's firearms by posting photographs of the firearms on social media. *Id*. Two of those firearms appear to be an assault rifle and a submachine gun, both with high-capacity magazines. *See* Exhibits 3, Facebook Image of Rifle, and 4, Facebook Image of Submachine Gun.

The number of individuals to whom Defendant illegally sold firearms to is not known. In his post-arrest interview with investigators, Defendant claimed he sold firearms to only two friends. PSR at ¶ 26. Given the evidence of Defendant's firearms trafficking and dealing, this statement is plainly false; however, Defendant also told investigators that he did not know the full names of the buyers, and therein may lay a kernel of truth. *Id*. Defendant did not intentionally document the illegal transactions in any way. Operating in the illegal firearms market, Defendant of course understood that the fewer questions he asked, the better. Defendant made no inquiry of identity or criminal background, as would otherwise be required in a firearm transfer between a duly licensed individual and dealer. *Id*. Therefore, when pressed by

---

2021, 20:13-22. Finally, 8 firearms likely attributable to Defendant's trafficking were recovered in Massachusetts by law enforcement officers at various times between July 2019 and December 2021. PSR at ¶ 28.

[3] This individual testified for the Government at trial, and his identity is included in the PSR.

investigators to describe the actions he took to ensure that the firearms sales were lawful, Defendant candidly admitted, "not much." *Id*.

Communications seized from Defendant's mobile phone shed some light on Defendant's illegal dealing practices. In one instance, Defendant received an order from a prospective buyer in the form of a screenshot of a Taurus Judge revolver being sold online. *See* Exhibit 5, Web Image of Firearm. Defendant forwarded the image to his supplier, the straw purchaser, to fulfill. *See* PSR at ¶ 20. In another instance, Defendant proactively shopped a firearm that the straw purchaser had made know was available for purchase – specifically, a North America Arms revolver. The straw purchaser sent Defendant a photograph of the revolver on the shelf at Dahlonega Gold and Pawn, and Defendant sent the same image to a contact saved in his phone. *Id*.

Defendant was motivated by profit. Defendant repeatedly drove over 1,000 miles to Georgia to buy firearms from a straw purchaser who bought them from a retailer (Dahlonega Gold and Pawn) whose prices had very small markups, and who resold those firearms at or near cost.[4] At trial, evidence was introduced of Dahlonega Gold and Pawn's retail prices for certain

---

[4] The straw purchaser frequently sent photographs of firearms for sale at Dahlonega Gold and Pawn with the price tags visible. By way of example, the web image of the Taurus Judge that Defendant sent to the straw purchaser to order, Exhibit 5, contains a price ($359.79). At trial, evidence of communications between Defendant and the straw purchaser concerning the order were introduced as follows:

| | |
|---|---|
| Straw purchaser | "Would have to order it" |
| Defendant | "Ok how much you think if I take two of them" |
| Straw purchaser | "So that 740 and 792 after tax" |

The straw purchaser appears to quote Defendant a price reflecting his acquisition cost without including any profit margin. Therefore, straw purchaser's claims to investigators that he often did not profit off of the firearms he resold, and that he viewed the transactions as part of a hobby, have a ring of truth. *See* Exhibit 6, Partial Transcript of Interview with Straw Purchaser, August 8, 2019.

Glock pistols and Taurus G2C pistols that Defendant later resold in Massachusetts. Dahlonega Gold and Pawn sold the Taurus G2C pistols for $189; Defendant sold the same firearms for $250 and $360. Ex. 2, Tr. Dec. 16, 2021, 13:13-16. Dahlonega Gold and Pawn sold the Glock pistols for $485; Defendant sold the same firearms for $1,000. *Id*. at 13:19-20. Additionally, in one text message exchange with the straw purchaser on July 2, 2019, Defendant apologized for not being able to "make it tomorrow" because of an event he was planning, and he bemoaned: "The holiday is messing up my $". Exhibit 7, Excerpted Text Messages from Defendant's Phone, 774-203-6780. And when investigators searched Defendant's warehouse, they discovered a hand-written ledger of specific models of firearms and their corresponding retail prices, further suggesting Defendant's consciousness of the profitability of his crimes. PSR at ¶ 27.

As a result of Defendant's firearms trafficking and dealing, illegal firearms proliferated in Massachusetts communities unchecked. At least 8 firearms bought by the straw purchaser at Dahlonega Gold and Pawn between March 2019 and June 2019 were later recovered by law enforcement in Massachusetts in dangerous circumstances. On at least one occasion, a firearm was used in a violent crime in which someone was shot and seriously injured. Many of these firearms have direct connections to Defendant.

On the eve of Defendant's trial, a .40 caliber pistol loaded with 12 bullets was abandoned near a gas station in Taunton. PSR at ¶ 28. It was found by an ordinary citizen under a pile of leaves and turned over to the police on December 1, 2021. *Id*. The case for that firearm was found by investigators when they searched Defendant's warehouse more than two years earlier, in July 2019. *Id.* Similarly, Defendant acquired the North American Arms revolver that he was shopping to one of his phone contacts. While it is unclear who ultimately purchased the firearm

5

from Defendant, what is certain is that the very same firearm was found in a vacated hotel room in Brockton by cleaning staff just a few months later, on October 22, 2019.

Most egregiously, a fifteen year old girl was caught in the crossfire at the Braintree Mall during a shooting sparked by gang rivalry on July 3, 2020.  PSR at ¶ 28; Exhibit 8, Excerpt of Braintree Police Department Incident Report, Narrative of Patrolman John Connolly, July 4, 2020.  She did not know any of the individuals fighting and she was not involved in the altercation; she was merely there to shop in Nordstrom when shots rang out.  Ex. 8, p. 2.  She was transported by ambulance to the Boston Medical Center where she was treated for two non-fatal gunshot wounds to her right hand and chest.  *Id*.  Six 9 mm spent shells were found at the scene of the shooting.  *Id*.  Later, investigators located a black Taurus G2C 9mm pistol discarded on the first floor of the Mall garage, along the path of the shooter's flight.  *Id*.  The serial number of the firearm was traced to a transaction with Defendant's straw purchaser at Dahlonega Gold and Pawn on April 16, 2020.

## II.     DETERMINING THE SENTENCE

### a.  Guidelines Calculations

While the Guidelines are advisory and not mandatory, *United States v. Booker*, 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [ ] a court should ordinarily begin by calculating the applicable guideline range." *United States v. Gilman*, 478 F.3d 440, 445 (1st Cir. 2007); *see Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark."). Probation determined that Defendant's total offense level is 24 and that he should be assigned Criminal History Category I, resulting in a Guideline sentencing range of 51 – 63 months imprisonment, 1 – 3 years of supervised release, and a fine between $20,000 and $250,000.  PSR

at ¶¶ 44, 50. The Government agrees with Defendant's Guideline sentencing range as calculated, except that the maximum of the fine guideline range is more accurately $200,000. U.S.S.G. § 5E1.2(c)(3).

### b. Application of the Section 3553(a) Factors

The Court should consider all of the Section 3553(a) sentencing factors and undertake "an individual assessment based on the facts presented." *Gall*, 552 U.S. at 49. These factors include: (1) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (2) "the history and characteristics of the defendant," id.; (3) the promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (4) "deterrence," 18 U.S.C. § 3553(a)(2)(B); (5) the need "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C); and (6) the Guidelines and Guideline range, 18 U.S.C. § 3553(a)(4). "A sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50; *see Nelson v. United States*, 555 U.S. 350 (2009). In this case, examination of these factors demonstrates that a sentence at the high end of Defendant's Guideline sentencing range is appropriate.

### i. Nature and Circumstances of the Offense, and Seriousness of the Offense

In determining the particular sentence to be imposed on Defendant by analyzing the nature and circumstances of the offense, the Court should consider the need for the sentence to "reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(2)(A). In this case, Defendant engaged in the indiscriminate sale of deadly weapons into the criminal community in Massachusetts. He did so knowing, or at least he should have known, that the transactions were not serving a law-abiding purpose. *See, e.g., United States v. Taylor*, 845 F. 3d 458, 461 (1st Cir.

7

2017) (no error in application of trafficking enhancement when defendant transferred sawed-off shotgun to individual who planned to resell it and "there was no indication that [the individual] would be the unusual firearms dealer who could legally own, much less legally resell a sawed-off shotgun"); *United States v. Ilarraza*, 963 F. 3d 1, 12-13 (1st Cir. 2020) (number and type of firearms bought over a short period of time supported inference that purchasers intended to use or dispose of firearms in connection with some nefarious activity). As another court has observed after evaluating a similar case at sentencing, the future harm of extensive firearms trafficking is "immeasurable." *United States v. Hernandez*, 663 F.3d 370, 373 (5th Cir. 2011).

Defendant's conduct is extremely serious and put people's lives in danger. As one court characterized it, there is an "epidemic of handgun violence in communities within [the District of Massachusetts]." *United States v. Politano*, 522, F. 3d 69, 72 (1st Cir. 2008). Many of the firearms recovered in Massachusetts that were bought at Dahlonega Gold and Pawn by Defendant's straw purchaser ended up in dangerous situations or in the hands of dangerous people. Some of the firearms were abandoned in places where anyone could have found them and converted them for illicit use, or unintentionally harmed themselves or another with them. Not unexpectedly, other firearms were found in the possession of and connected to gang members, a narcotics trafficker, and other criminals. At least one innocent bystander has been harmed already, and there is risk that more people will be harmed given the number of firearms Defendant likely trafficked from Georgia.

Moreover, the nature and circumstances of the offense should be viewed in light of both the number of firearms trafficked by Defendant, and Defendant's motivation for engaging in the trafficking. These are interrelated factors that resolve to one principal force: greed. The desire for money drove Defendant to transport dozens of firearms all the way from Georgia, where he

found the cheapest source of firearms.  The desire for money compelled Defendant to sell the firearms in criminal commerce, where it was most convenient to find willing buyers.  And it was the desire for money that motivated Defendant to sell the firearms despite knowing that they would be used or disposed of in an unlawful way.  In sum, Defendant allowed his greed to endanger people's lives, and that cannot be tolerated by the criminal justice system.

### ii. History and Characteristics of Defendant

Section 3553(a)(1) requires the Court to consider "the history and characteristics of the defendant."  Most relevant to this analysis are (i) Defendant's prior criminal history, and (ii) his conduct towards the Court and other authorities during these proceedings.

While Defendant does not have a history of frequent encounters with the criminal justice system, his record is notable because of his prior felony conviction for possessing a firearm.  PSR at ¶ 47.  Defendant's conduct in that case also involved the transportation of a firearm illegally.  He received a significant 10-year sentence, but he served most of it on probation.  Because firearms crimes create such a danger to the community, Courts have observed that repeat offenders deserve more serious sentences.  *See United States v. Laury*, 985 F.2d 1293, 1310 (5th Cir. 1993) (repeated convictions displayed tendency towards recidivism that warranted more serious sentence); *United States v. Smith*, 505 F.3d 463, 470 (6th Cir. 2007) (imposing above guidelines sentence where prior incarceration "was obviously not sufficient to comply with the purposes of § 3553(a)(2)"); *United States v. Schmude*, 901 F.2d 555, 559 (7th Cir. 1990) ("[r]ationally, if a defendant has been convicted for the same offense more than once, he has demonstrated the need for greater sanctions to deter him from committing that same crime again – greater sanctions than might be required for a defendant who has never been convicted of a similar offense").  Here, a 63-month sentence of imprisonment represents a reasonable increase

in punishment relative to his first firearm conviction, and is sufficient, but not greater than necessary, to achieve the goals of sentencing.

Defendant's attitude towards authority is a characteristic that the Court has had sufficient opportunity to observe during this case, and further supports the imposition of a sentence at the top of the Guideline sentencing range. During preliminary hearings shortly before trial, the Court observed that Defendant was "disruptive" and refused to obey court orders, such that it was compelled to issue a written order concerning the measures it might take to ensure that a fair and orderly proceedings could take place. *See* Docket Entry (D.E.) 283, Notice of Potential Waiver of Right of Self Representation or Other Sanctions for Disruptive Conduct, December 20, 2021, Saylor, C.J., p. 2. Defendant also refused to accept discovery from the Government. Separately, Defendant was found in violation of his pre-trial supervision on three occasions, and he was ordered detained as a result. *See* D.E. 185, Decision on Revocation of Pretrial Release, Boal, M.J., July 15, 2021. According to the magistrate court, Defendant repeatedly demonstrated contempt for the Probation Office and its agents, and an unwillingness to follow conditions of pretrial release. *Id*., p. 10-11.

The pattern of behavior is well established at this juncture of the case. Indeed, Defendant refused to be interviewed by Probation for the purposes of preparing an accurate and complete PSR. PSR at ¶ 58. The Court may properly take Defendant's conduct into account as an individual characteristic when imposing sentence. *See United States v. Ranger*, 827 Fed. Appx. 271, 273 (4th Cir. 2020) (sentence of 480 months substantively reasonable because the sentence was explicitly tailored to address the defendant's individual characteristics, including his defiant attitude); *United States v. Doston*, 553 Fed. Appx. 937, 940 (11th Cir. 2014) (supervised release revocation sentence of imprisonment not substantively unreasonable when based in part upon

concern about the defendant's attitude, inappropriate comments, and temper). Because Defendant has not shown the appropriate respect and deference to the Court and other authorities throughout the course of these proceedings, a sentence of 63 months is justified.

### iii. Respect for the Law, Deterrence, and Protecting the Public

Under Section 3553(a)(2), the Court must also consider the need for the sentence imposed to promote respect for the law, afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, among other things. 18 U.S.C. § 3553(a)(2). In this case, Defendant has not demonstrated acceptance of responsibility for his crimes, and more significant sanctions are required to satisfy the needs of sentencing. PSR at ¶ 31.

Defendant has provided the Court with significant reason to be concerned about his ability to respect legal authority or conform his behavior to the requirements of the law upon completion of his sentence. Defendant's refusal to acknowledge the wrongfulness of his conduct is a factor supporting a higher sentence under Section 3553(a). *See, e.g., United States v. Diaz-Bermudez*, 778 F. 3d 309, 313 (1st Cir. 2015) ("Furthermore, whether Diaz was sincere in accepting responsibility was relevant for considering whether a sentence "afford[s] adequate deterrence" and "protect[s] the public from further crimes of the defendant."). More generally, the strong financial incentive to commit firearms trafficking offenses has prompted at least one court to vary upwards at sentencing for deterrence. *See United States v. Cavera*, 550 F. 3d 180, 195-96 (2d Cir. 2008) (affirming upward variance based upon district court's finding that firearms trafficking was a more serious problem in New York City because of population density and stricter gun control laws that create a more profitable black market). Because of the financial incentive in general, and it's effect in this case specifically, the Government submits

that imposing a fine at the top of the Guideline sentencing range is an important component of Defendant's sentence.

### iv. Guidelines Range and Pertinent Policy Statements

The Guidelines themselves are a Section 3553(a) factor. "The fact that § 3553(a)[(4) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S.at 50, n.6. One of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)." 28 U.S.C. §§ 991(b)(1)(A), 994(f). The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita*, 551 U.S. at 350.

The Guidelines section governing Defendant's Guidelines sentencing range is U.S.S.G. § 2K2.1. In its application notes to that section, the Sentencing Commission remarked: "If the defendant trafficked substantially more than 25 firearms, an upward departure may be warranted." U.S.S.G. § 2K2.1 Application Note 13(C). Defendant's Guideline sentencing range takes into account the number of illegal firearms transactions in which he engaged, but not necessarily the number of firearms he trafficked. *See* PSR at ¶ 35 (6-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(C)); *Hernandez*, 633 F. 3d at 378 (defendant trafficked a "conservative" total of 103 firearms and received an upward departure of 34 months based, in part, on Application Note 13(C)). While the trafficking enhancement has been applied in this case because Defendant trafficked "two or more" firearms, it is a constant regardless of how many firearms Defendant actually trafficked. *See* U.S.S.G. § 2K2.1, Application Note 13(A)(1). Presumably, the Sentencing Commission recognized that the enhancement would become less

reflective of the seriousness of the offense in those cases where the number of trafficked firearms was high.

The Government has not moved the Court for an upward departure here. Nevertheless, the Sentencing Commission's encouragement of an upward departure under the circumstances is a relevant Section 3553(a) factor in support of a sentence at the top of Defendant's Guideline sentencing range. While the precise number of firearms trafficked by Defendant is unknowable, it can be safely concluded that the number is substantially more than 25, based on the testimony of trial witnesses, statements made by Defendant's straw purchaser to investigators, evidence of communications from Defendant's phone, and law enforcement's recovery in Massachusetts of numerous firearms linked to Defendant and his straw purchaser in Georgia.

### III.   CONCLUSION

For all the foregoing reasons, the Government respectfully recommends a sentence of 63 months incarceration, 3 years supervised release, and a fine of $200,000, as such a sentence is sufficient, and not greater than necessary, to satisfy the goals of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   /s/ *Fred M. Wyshak, III*
FRED M. WYSHAK, III
Assistant United States Attorney
617-748-3330
fred.wyshak2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and to Defendant via email, care of Kristal Tatarian, Program Administrative Assistant at Wyatt Detention Facility, for hand delivery by her or one of her authorized agents, on April 13, 2022.

                                                /s/ *Fred M. Wyshak, III*
                                                Fred M. Wyshak, III
                                                Assistant United States Attorney

Date: April 13, 2022